245 F.2d 567
 FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellant,
v.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant-Appellee.
FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellee,
v.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant-Appellant.
 No. 11933-4.
 United States Court of Appeals Seventh Circuit.
 June 25, 1957.
 
 COPYRIGHT MATERIAL OMITTED John H. Bishop, William M. Doherty, Chicago, Ill., Orrin G. Judd, New York City, Royal L. Coburn, Gen. Counsel, G. J. Oppegard, Federal Deposit Ins. Corp., Washington, D. C., Charles E. McGuinness, New York City, of counsel, for appellant-appellee, Federal Deposit Ins. Corp.
 Frank D. Mayer, Louis A. Kohn, Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel, for Continental Ill. Nat. Bank & Trust Co. of Chicago.
 Before MAJOR, FINNEGAN and LINDLEY, Circuit Judges.
 MAJOR, Circuit Judge.
 
 
 1
 Plaintiff, Federal Deposit Insurance Corporation (sometimes referred to as FDIC), is a corporation duly organized and existing under and by virtue of an Act of Congress of the United States as amended by the Act of August 23, 1935 (Title 12 U.S.C.A. § 264) and again by the Act of September 21, 1950 (Title 12 U.S.C.A. § 1811 et seq.), designated as the Federal Deposit Insurance Act. Defendant, Continental Illinois National Bank and Trust Company of Chicago (sometimes referred to as Continental), is a duly chartered and organized national banking association with its principal place of business in the City of Chicago, Illinois, and at all times pertinent to the instant suit was an insured member bank as defined by Title 12 U.S.C.A. § 1813.
 
 
 2
 The present action was instituted to recover assessments, for the period from July 1, 1948 through June 30, 1953, alleged to be due from defendant under the statutes relating to federal deposit insurance. Numerous items were placed in issue by the pleadings, all but four of which were settled by agreement of the parties. On these a trial was had by the court upon a party stipulation, together with documentary and oral testimony. The court, in conformity with its findings and conclusions, entered judgment in favor of plaintiff on two of such items and in favor of defendant on the remaining items. Each of the parties appeals from that portion of the judgment adverse to it.
 
 
 3
 An insured bank is, under the Act, made liable for assessments, the base for which is its deposits, as the latter term is defined and contemplated by the Act. All the items in dispute involve the treatment to be accorded certain alleged deposits, that is, whether they constitute a portion of the base for assessment purposes.
 
 
 4
 The four items, giving rise to as many contested issues, are as follows:
 
 
 5
 1. Whether in case of reciprocal deposit accounts with other banks defendant's liability for assessments under the Federal Deposit Insurance Act of 1935 is measured by the gross or net balance of the accounts.
 
 
 6
 2. Whether under the Federal Deposit Insurance Act of 1950 defendant was entitled to deduct from the amount of its total deposits the amount of various uncollected cash items in process of collection on the "base day." This item includes government bonds, cashed by defendant on the assessment date but neither collected nor credited to deposit accounts on that date.
 
 
 7
 3. Whether the amounts of credits arising under the so-called "contract reserve" account constituted deposits under the Federal Deposit Insurance Act of 1935.
 
 
 8
 4. Whether the amounts of payroll deductions and taxes deducted by defendant from its employees' salaries constituted trust funds or deposits within the meaning of the 1935 and 1950 Acts.
 
 
 9
 In the district court, issues 1 and 2 were decided adversely to plaintiff, while 3 and 4 were decided adversely to defendant. We shall discuss these issues in the order of their enumeration.
 
 Contested Issue 1
 
 10
 Reciprocal accounts exist where two banks maintain deposit accounts with each other. Such accounts are termed "due to" and "due from" accounts. Defendant maintained reciprocal bank accounts with 26 large banks in 9 principal cities throughout the country. It is defendant's position that only the net amount, if any, due another bank constituted the measure of deposit liability and became a part of the assessment base. In contrast, plaintiff contends that the deposit of another bank in Continental is to be accorded the same treatment as any other deposit and that the gross amount of the deposit is the assessment base, irrespective of the amount of Continental's deposit in such other bank.
 
 
 11
 The stipulation contains an illustration of the method Continental followed in handling reciprocal bank balances in computing its assessment base, as follows: "If bank `A' had a deposit account in Continental of $250.00 and Continental had a deposit balance in bank `A' of $100.00, Continental would include only the difference in its deposit liabilities for assessment purposes, namely $150.00. If the conditions were reversed and bank `A' had a deposit balance in Continental of $125.00 and Continental had a deposit balance in bank `A' of $300.00 Continental would not include any of the deposit due to bank `A' in its deposit liabilities for assessment purposes."
 
 
 12
 The relevant portion of the 1935 Act as it pertains to the issue under discussion is contained in Sec. 264(h) (1), which provides among other things that the assessment base shall be determined by the "* * * amount of liability of the bank for deposits (according to the definition of the term `deposit' in and pursuant to paragraph (12) of subsection (c) of the section, without any deduction for indebtedness of depositors)." The last named subsection states: "The term `deposit' means the unpaid balance of money or its equivalent received by a bank in the usual course of business and for which it has given or is obligated to give credit to a commercial, checking, savings, time or thrift account * * *, together with such other obligations of a bank as the board of directors shall find and shall prescribe by its regulations to be deposit liabilities by general usage * * *."
 
 
 13
 This appears to be an appropriate point to take note also of the 1950 Act, even though the issue is for decision under the terms of the 1935 Act. Title 12 U.S.C.A. § 1817(a) contains, so far as it relates to the point under discussion, substantially the same language as that contained in the 1935 Act, with the following proviso: "Provided, That the bank (1) may deduct (i) from the deposit balance due to an insured bank the deposit balance due from such insured bank * * *." Plaintiff makes much of the point that Congress by this proviso amended the law so as to allow a deduction not theretofore permitted by the 1935 Act. Otherwise, so it is suggested, there would have been no purpose on the part of Congress in adopting the proviso. The district judge rejected this reasoning and stated in a memorandum opinion "that the pertinent provisions of the 1950 statute merely clarified the previous statute."
 
 
 14
 No other court has decided the issue under discussion, so far as we are aware. The issue, therefore, must be determined from the statutory language, together with such aids to construction as may be available. It appears plain that the assessment base is the deposit liability of the bank but that this does not encompass all of a bank's accounts even though labeled as deposits. It is the ordinary and usual deposits of a bank which measure its strength, its growth and development. The principal earnings are derived from its investment of such deposits. If a bank lends to a depositor, it receives interest on such indebtedness the same as though the deposit had been otherwise invested. In contrast, reciprocal deposits are for the convenience of the banks involved and their customers. They add nothing to the earnings of either bank except the bank which holds a net balance. If all the loanable assets of a bank were deposited in reciprocal accounts, it could not long survive.
 
 
 15
 Congress defined a deposit as the money received by a bank in the "usual course of business." Reciprocal deposits, in our view, are not thus received. This view is fortified by the fact that out of a total of 13,600 insured banks in the country, not more than three to four hundred carried reciprocal accounts. In other words, out of all insured banks fewer than 3% maintained the character of deposits with which we are now concerned.
 
 
 16
 Using the stipulated illustration heretofore noted, was the deposit liability of Continental to bank "A" $250.00, the amount of "A's" deposit with Continental, or was it $150.00, the difference between the amount of Continental's deposit with bank "A" and the latter's deposit of $250.00 with Continental? While we are far from experts in the refinements of the banking business, it borders on the fictional, so we think, to assert that Continental's deposit liability was more than $150.00, the difference between the two deposits. If "A" had $15.00 in his pocket which belonged to "B", and "B" $10.00 in his pocket which belonged to "A", the latter's liability to "B" would be $5.00 rather than $15.00. Any other conclusion would ignore the realities of the situation, including the actual relationship existing between the parties.
 
 
 17
 As might be expected, plaintiff places much reliance upon the language contained in Sec. 264(h) (1) which provides that deposits shall be included in the assessment base "without any deduction for indebtedness of depositors." Obviously, this language is of no benefit to plaintiff if the term "deposit" is accorded its usual and ordinary meaning. Moreover, in the illustration used, bank "A" had no indebtedness to Continental; the latter was indebted to bank "A" in the amount of $150.00. This amount Continental agrees would have been includible in its base for assessment purposes.
 
 
 18
 Plaintiff relies upon its administrative interpretation of the statute, consistent with the position which it now takes. Defendant, however, has at no time acquiesced in such interpretation; in fact, it has consistently from the beginning urged the position which it now takes. In the view which we take of the purpose and intendment of the statute, we are not impressed with plaintiff's interpretative ruling.
 
 
 19
 Plaintiff has a more plausible argument based upon the 1950 amendment which, as heretofore shown, expressly provided for the exclusion of a reciprocal deposit in another bank. Our attention is called to the legislative history relative to this amendment which indicates that Congress regarded the proviso as an amendment rather than as an interpretation of the previous statute. The district court expressed the view that the 1950 amendment was merely a clarification of the previous statute. We think it not of controlling importance whether the latter Act be treated as an amendment or a clarification. The fact is that a controversy existed between plaintiff and defendant (as well as other banks) relative to the issue under consideration, and to resolve such controversy Congress added the proviso. By such action Congress recognized the soundness of defendant's position. How ever the proviso be characterized, the doubt theretofore existing was resolved. Nothing was accomplished other than to make certain that which previously had been a matter for statutory interpretation.
 
 
 20
 More important is the treatment accorded reciprocal bank balances by other federal agencies. The Federal Reserve Bank, like plaintiff, was an agency of the Federal Reserve System. The Federal Reserve Bank instructed its members carrying reciprocal accounts to report only the net balances of such accounts. The Comptroller of the Currency also called for a report of only the net balances of reciprocal deposits. We think, contrary to plaintiff's contention, that this evidence was properly admitted. Certainly it shows a recognition by these agencies of the actual relationship existing between banks with reciprocal accounts. More than that, the rulings are consistent with and lend support to the view that such deposits are not received in the "usual course of business," and that the bank receiving such deposits incurs liability only to the extent of the net balances of such deposits. We agree with the holding of the district court on this issue.
 
 Contested Issue 2
 
 21
 This issue relates to cash items, that is, checks, drafts and other instruments providing for the payment of money which a reporting bank received in the regular course of business and paid or credited conditionally to a deposit account. These items are called "float" and, in a bank the size of defendant, many thousands are handled each day. The period involved is from 1950 to 1954.
 
 
 22
 The 1935 Act provided for an assessment base consisting of the average daily deposits at the end of each calendar day for six months, deducting, however, "the total of such uncollected items as are included in such deposits and credited subject to final payment." The 1950 Act changed the assessment provision so as to simplify the work of the banks incident to the ascertainment of the average deposit liability during the semiannual periods. There were designated as base days March 31 and June 30 for the first and September 30 and December 31 for the second semiannual period. Two methods were provided for computing the amount of such deposits, that is, the (aa) method and the (bb) method. Defendant utilized the former, which provides that the reporting bank may deduct cash items as determined "by multiplying by 2 the total of the cash items forwarded for collection on the assessment base days (being the days on which the average deposits are computed) and cash items held for clearings at the close of business on said days, which are in the process of collection and which the bank has paid in the regular course of business or credited to deposit accounts." Sec. 1817 of the 1950 Act.
 
 
 23
 The items here involved are only those "forwarded for collection." Plaintiff in its brief classifies such items as follows:
 
 
 24
 "1. Cash items received and forwarded prior to the base day.
 
 
 25
 "2. Cash items received prior to the base day and forwarded on the base day.
 
 
 26
 "3. Cash items received on the base day and forwarded on the following day."
 
 
 27
 The items in class 1 were received after the close of business on a Friday and forwarded for collection on Saturday or Sunday preceding Monday, a base day, but remained uncollected on that day. The items in class 2 were received in the interim between the closing of the bank on Friday and the opening of the bank on Monday, but not forwarded for collection until the latter day. The items in class 3 were received on Monday but not completely processed and forwarded until the following day. All of the items in the three classes were conditionally credited on Monday, the base day.
 
 
 28
 Upon receipt of a "float" deposit, the bank issued a slip which provided in effect that the deposit was conditional, with the right reserved to refuse to honor or pay checks drawn against such deposit. It was also provided that items received for collection after regular banking hours might be treated by the bank as a deposit or collection of the succeeding business day.
 
 
 29
 The class 2 items are clearly deductible. They were forwarded for collection on base days and are in compliance with the literal language of the statute. Plaintiff in its brief states:
 
 
 30
 "The items in this category meet the requirement of the statute of being forwarded for collection on the assessment base day, but they do not meet the requirement of the regulation that they must have been received on the base day. We must, therefore, consider whether the regulation is consistent with the statute." Plaintiff makes the feeble argument that a regulation promulgated in 1950 required that the items be both received and forwarded on base days. This regulation, insofar as it required receipt of such items on base days, is in effect an amendment of the statute, it is inconsistent therewith and in that respect is void.
 
 
 31
 Class 1 and class 3 items present a more difficult problem. As noted, the former includes items both received and forwarded on Saturday or Sunday preceding a base day but which remained uncollected on the base day and for which the depositor had not previously received credit. Class 3 items were received on the base day but not processed and forwarded until the following day. The depositor, as to this class of items, received only a conditional credit on the base day.
 
 
 32
 The controversy as to class 1 and class 3 items depends upon an interpretation of the term "base days" as employed in the statute. Plaintiff made no attempt to interpret or define "base days" until it promulgated a regulation in 1954, entitled "Periods of Deductions for Uncollected Items." (Sec. 327.1(a) of the 1954 Regulations.) The regulation provided:
 
 
 33
 "The term `base day' shall be the period of time beginning with the time of the closing of the books of the bank on the last business day immediately preceding the assessment base day to the time of the closing of the books of the bank on the base day according to the normal practice of the bank. Holidays and other nonbusiness days intervening between the preceding business day and the base day are a part of the base day."
 
 
 34
 Paragraph (f) of the same section of the regulation provided:
 
 
 35
 "A cash item shall be deemed to have been forwarded for collection on the base day if it has been received for collection on the base day and has been either forwarded for collection on that day or is in the process of forwarding in accordance with the normal procedure of the bank, even though the item may be in the possession of the bank at the time of the closing of the books on the base day."
 
 
 36
 It is plain that class 1 items are now deductible under paragraph (a) and that class 3 items are now deductible under paragraph (f) of the regulation. This much appears to be conceded because plaintiff's suit covers only the period between the amendment of the Act in 1950 and the promulgation of the 1954 regulation.
 
 
 37
 Plaintiff contends that the term "base day" as used in the statute should be interpreted to mean a calendar day, that is, the time from one midnight until the next. Any merit in this contention appears to be dissipated from the fact that plaintiff in 1954 defined "base days" in the manner above shown without any change by Congress in the statutory language. If a base day meant a calendar day in 1950, it must have meant the same in 1954. If it encompassed only a calendar day when the amendment was enacted, we think a serious question would be raised as to the validity of the 1954 regulation which defined a base day as including Saturdays and Sundays prior thereto, as well as the day following as to certain designated items.
 
 
 38
 In any event, the 1954 regulation constitutes a recognition on the part of plaintiff of the unreasonable limitation which it would have us place upon the meaning of "base day" as used in the statute. The situation before us is an apt illustration. If defendant had permitted the accumulation of all cash items between the time it closed its bank for business purposes on Friday until it opened on Monday (a base day) and had forwarded such items on that day, there could be no question as to their deductibility. To hold that they are not deductible because the bank, in keeping with efficiency and sound banking practices, maintained a force for the purpose of forwarding such items on Saturday and Sunday, is barren of any logic, as plaintiff's 1954 regulation appears to recognize.
 
 
 39
 Much is said as to whether the 1954 regulation should be applied retroactively so as to cover the items in issue. Defendant argues in the affirmative, plaintiff in the negative. We think this issue need not be resolved. If plaintiff had the authority in 1954 to interpret the statute as it did, we think a court has the authority to place a like interpretation upon the statute during the period from 1950 to 1954. In Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, at page 135, 56 S.Ct. 400, 397, 80 L.Ed. 528, it was contended that an amended regulation was void because it was retroactive. The court rejected the contention, but in doing so made the following pertinent observation:
 
 
 40
 "Since the original regulation could not be applied, the amended regulation in effect became the primary and controlling rule in respect of the situation presented. It pointed the way, for the first time, for correctly applying the antecedent statute to a situation which arose under the statute."
 
 
 41
 Included in contested issue 2 are government bonds cashed on base days and held by defendant for collection at the close of such days. It is urged that such bonds are not "cash items," and that a distinction should be drawn between them and checks and bank drafts. We are not impressed with this argument. In our view, all the items included in contested issue 2 were deductible.
 
 Contested Issue 3
 
 42
 A brief statement of the facts will suffice to bring into focus the issue for decision. In financing installment paper defendant purchased sales contracts from a customer (a dealer engaged in selling retail merchandise on credit to a person sometimes called the buyer), without recourse, under an agreement which provided for remittance to the customer of 90% of the amounts owing under such contracts (less 1/8 of 1% cash discount), and crediting the remaining 10% to an account set up on defendant's books and designated as the customer's "Contract Reserve." The agreement referred to the "Contract Reserve" as a deposit credited to the customer to be used in accordance with the terms of the agreement. In brief, the "Contract Reserve" account was utilized as a means of securing the defendant for the balance due on the sales contract made between the buyer and the dealer and sold and assigned by the latter to defendant. The agreement between the customer (dealer) and the bank provided that the reserve account should be maintained at a specified level. When below that level, the difference was to be made up by the customer; when above the level, and then only, the customer was entitled to draw on the account. In practice, only credit was extended to the buyer, no withdrawal was permitted.
 
 
 43
 As relating to the question for decision, it can be stated that the sole purpose of the arrangement between the customer and the bank was to secure the latter, and this was accomplished by withholding 10% of the contract purchase price. If the buyer satisfied his obligation, the 10% belonged to the customer. If, however, there was a default in payment by the buyer, the bank could utilize the reserve account to the extent necessary to prevent any loss on its part.
 
 
 44
 The asserted liability is for a period prior to 1950, when the Act was amended in a manner which apparently provided that the alleged deposits under discussion are excludible from the tax base. The question, therefore, must be decided under the 1935 Act.
 
 
 45
 The district court decided this issue adversely to defendant. In our view, this was error, notwithstanding there is some authority, to which we shall subsequently refer, which furnishes support for plaintiff's position. In connection with our discussion, under contested issue 1 we have set forth the statutory definition of an assessment base as being the "* * * amount of liability of the bank for deposits," as well as the definition of the term "deposit."
 
 
 46
 Plaintiff in its brief under the present issue has set forth the statutory definition of "deposit" by breaking it down into separate phrases which we think pertinent even though it amounts to repetition. The statutory definition thus treated is as follows:
 
 
 47
 "(a) `The unpaid balance'
 
 
 48
 "(b) `of money or its equivalent'
 
 
 49
 "(c) `received by a bank'
 
 
 50
 "(d) `in the usual course of business'
 
 
 51
 "(e) `and for which it has given or is obligated to give credit'
 
 
 52
 "(f) `to a commercial, checking, savings, time or thrift account.'"
 
 
 53
 In our view, the credit extended to the reserve account (that is, the 10% withheld from the purchase price) does not fall within the terms of the statutory definition because it created in both the customer and the bank a right which was only conditional. Whether the customer could utilize this credit depended solely upon performance by the buyer. If the buyer performed his obligation, the purpose for which the so-called deposit was made was accomplished; in that event, the 10% belonged to the customer. On the other hand, in case of default on the part of the buyer, the 10% deposit became that of the bank. As we have noted, this was the purpose of the arrangement between the customer and the bank.
 
 
 54
 We are unable to discern how it can be held that the credit extended to the reserve account can be characterized as "money or its equivalent received by a bank." It must be certain that the bank received no money from the customer, that it received only the contract which it purchased. Can such a contract be considered as the "equivalent" of money? We think the answer must be in the negative. If the contract be held as the equivalent of cash, we see no reason why the bank should not have paid the customer its face value rather than 90%. It may be that the bank by paying 90% of the face value of the contract recognized it as the equivalent of cash to that extent. By the same token, however, both the bank and the customer recognized the contract to the extent of the 10% withheld as not the equivalent of cash.
 
 
 55
 Another serious question is whether defendant was obligated to give credit "to a commercial, checking, savings, time or thrift account." Obviously, the last four named forms of accounts are without application. Plaintiff appears to so recognize but argues that the reserve account was a commercial account because it arose out of a commercial transaction. That is a non sequitur. We suppose it is true that the account had its genesis in a commercial transaction but it could not be utilized by the customer in the course of trade or commerce.
 
 
 56
 At the risk of being repetitious, we again point out the absence of liability upon defendant at the inception of a credit to the reserve account. In any event, it is our view that when Congress predicated the assessment base upon the "amount of liability of the bank for deposits," it encompassed only such deposits as imposed upon the bank an unconditional liability and which conferred upon the depositor an absolute right to be paid the amount of his deposit either upon demand or upon such conditions as might be imposed in connection with the deposit. That certainly is true as to the "checking, savings, time or thrift account" enumerated in the statutory definition of "deposit." We see no reason why it should be less true as to the remaining classification, that is, "commercial."
 
 
 57
 Plaintiff cites and relies heavily upon Industrial Bank of St. Louis v. Federal Deposit Ins. Corp., D.C.E.D.Mo., 93 F. Supp. 916, 918. Defendant attempts, without much success, to distinguish the situation there involved and that here. While the case supports plaintiff's position, we do not agree with either the reasoning or the result. Neither do we agree that Union Electric Light & Power Co. v. Cherokee Nat. Bank of St. Louis, 8 Cir., 94 F.2d 517, strongly relied upon by the court in the Industrial Bank case, is authority for the result reached. In the Cherokee case there was a special arrangement between the depositor and the bank by which the bank incurred a fixed obligation to pay. The court held there was a special deposit impressed with a trust in favor of the depositor. It is not claimed in the instant case that the reserve account was impressed with a trust under a provision of the statute, which will be referred to under contested issue 4.
 
 Contested Issue 4
 
 58
 This issue involves money withheld by defendant from salaries and wages of its employees for the following purposes: (1) payment of federal income taxes on employees' salaries; (2) payment of employees' share of federal social security taxes; (3) payment of employees' contributions to group life insurance premiums, and (4) purchase of government securities for employees. The period involved is from July 1, 1948 through June 30, 1953. The statutory definition of the term "deposit" both in the 1935 and 1950 Acts includes "trust funds held by such bank whether retained or deposited in any department of such bank." While the 1935 Act contained no definition of "trust funds," such a definition was provided in the 1950 Act (Title 12 U.S.C.A. § 1813(p)), as follows:
 
 
 59
 "The term `trust funds' means funds held by an insured bank in a fiduciary capacity and includes, without being limited to, funds held as trustee, executor, administrator, guardian, or agent."
 
 
 60
 We think these withholdings were held by the bank as trust funds either with or without the aid of the statutory definition provided in the 1950 Act. By agreement with their employees such funds were held for specified purposes and the bank was under obligation to apply them in accordance with the agreement But whether trust funds or not, they were deposits within the meaning of the statute. It is true, as defendant points out, that such funds do not represent cash received from the employees; however, the withholdings were the equivalent of cash. The situation is the same as though the amounts withheld had been paid to the employees and returned by them to the bank to be used by it for the purposes indicated. The point is that the bank incurred a liability for such funds which was absolute, in contrast to a contingent liability as existed under contested issue 3. We agree with the ruling of the district court on this issue.
 
 
 61
 The judgment is affirmed in part and reversed in part, with directions that it be vacated and a judgment entered in accordance with the views herein expressed. More specifically, the judgment is affirmed as to contested issues 1, 2 and 4, and is reversed as to contested issue 3.