**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**EUROPEAN AMERICAN BANK & TRUST CO., Defendant.**

No. 82 Civ. 585 (RLC).

United States District Court, S.D. New York.

Nov. 29, 1983.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; Susan Millington Campbell, Asst. U.S. Atty., New York City, Katharine H. Haygood, Sr. Attorney, FDIC, Ingeborg Chaly, Honors Attorney, FDIC, Thomas A. Brooks, Gen. Counsel, FDIC, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; Philip L. Graham, Jr., Lori Fisler Damrosch, Philip S. Weber, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

The Federal Deposit Insurance Corporation ("FDIC") is seeking to recover $2,230,-531.78 in assessment payments that it asserts the European American Bank & Trust Co. ("EAB") owes it pursuant to the

statutes relating to federal deposit insurance. The case is before this Court on FDIC's motion for summary judgment on its complaint and on the counter-claim asserted by EAB.

The dispute between the parties involves the treatment, under the Federal Deposit Insurance Act, ("FDI Act"), 12 U.S.C. §§ 1811 *et seq.*, of payments released through an electronic fund transfer system known as "CHIPS" (Clearing House Interpayment System). The FDIC maintains that EAB understated the amount of deposits it had from January, 1976 to October, 1981, and therefore, underpaid its assessment payments because it incorrectly excluded CHIPS transactions in calculating the deposits it held during that period. EAB contends that the CHIPS system is outside the scope of the FDI Act's definition of deposit, 12 U.S.C. § 1813(*l*)(1)–(5), and that even if CHIPS payments give rise to an assessable deposit, the FDIC calculated the assessment improperly.

EAB opposes FDIC's motion for summary judgment on the ground that resolution of the issues presented requires further factual development of the record. Certainly this case calls for application of the law to novel circumstances, but those are adequately set out. The only material questions EAB highlights in opposing the FDIC's motion are questions of law, which the Court can and does address here.

*Background*

CHIPS was established in 1970 to process an increasing volume of international and domestic fund transfers. Run by the New York Clearing House Association ("NYCHA"), a voluntary association of banks, the computerized system carries out the daily exchange of funds among NYCHA members and facilitates settlement of balances resulting from such exchanges. Each day some $200 billion is exchanged through the CHIPS system, including 90 percent of all international interbank transfers involving United States banks.

Exchanges in the CHIPS system are accomplished by a series of electronic computer impulses. A transfer of funds by one participant to another through the CHIPS system is known as a "release"; the receipt of such an impulse by one participant from another is called a "receive". During the period with which this lawsuit is concerned, the time prior to October 1, 1981, all release and receive messages were recorded on a central computer for a given day at a fixed time on that day, although the money involved was not actually transferred until settlement,[1] which occurred the following day. When, on a given day, a CHIPS participant transferred more money through release messages to another CHIPS participant than it obtained in receive messages from the other CHIPS participant, the excess of the monetary value of the messages released over that of the messages received was known as "net" on a bank-by-bank basis. When a CHIPS participant released more money to all other CHIPS participants on a given day than it received from all other participants, the excess of all releases by that participant over all receives was known as the bank's "net-net balance", or simply its "net-net".

Under the FDI Act, banks are required to make semi-annual assessment payments, which are analagous to insurance premiums, based on the amount of deposits that they hold. Under its system of assessing banks, the FDIC initially accepts a bank's certified statement of its deposits and assessment payments. Only later does the FDIC audit the bank to verify the validity of both the bank's certified statement of its deposits and the bank's assessment payment. During one such audit, the FDIC discovered the EAB's alleged understatement of its deposits and the concomitant underpayment of its assessment.

EAB has been a member of the NYCHA and a settling participant since January 16, 1979; from November 1, 1971 through January 15, 1979, EAB was a non-settling par-

---

1. Settlement refers to the time when each CHIPS participant actually transfers or receives the single amount identified by the computer as that participant's balance—the excess of all releases by that participant over all receives.

ticipant.[2] Apparently, for several years, in the assessment periods before 1978–79, EAB reported as an assessable deposit the net-net amount it was required to pay in settlement of its obligation to the CHIPS system. In 1978–79, EAB determined that it would change its treatment of CHIPS transactions, and effective with the statement for the period ending June 30, 1979, it began excluding these from its calculation of deposits that were subject to FDIC assessment.

EAB now claims that it was justified in excluding CHIPS transactions from assessable deposits because such transactions were not received or held by EAB until the time of settlement on the next business day, and that, unlike what EAB termed, "ordinary deposits", the transactions contributed nothing to the earning power of EAB. According to EAB, prior to October 1, 1981, it was the usual practice among the customers of CHIPS participating banks to instruct that CHIPS transfers be made on one business day ("Day 1") but to "cover" those payments with good funds only on the next business day ("Day 2").[3] Thus, the bank's payment message, or release, would often precede by one day, the actual transfer of funds to the bank by its customer. Since EAB did not actually hold the funds reflected in the CHIPS message, it claims it could not make use of them overnight for investment purposes.

The FDIC's theory as to why CHIPS transactions should be included as assessable deposits focuses on EAB's method of accounting with respect to CHIPS transactions. On the day when EAB issued a release message through CHIPS, it debited the account of the customer who requested that the transfer be made, and credited an account called "Due From CHIPS".[4] This credit, the FDIC maintains, was equivalent to a deposit since the release message for which settlement had not yet been made represented an irrevocable and unpaid obligation to pay the CHIPS participant to which the payment message had been sent.

The FDIC also claims that it has been accepting CHIPS assessments by participant banks from the time of CHIPS establishment in 1970. It states that it has been doing so on a net bank-by-bank basis only, although from 1977 to 1979, it contemplated changing the assessment system so that all CHIPS releases (rather than just the excess of releases over receives), would be considered assessable deposits. During that period the NYCHA carried on discussions with the FDIC, which culminated, to some extent, in a letter sent to the FDIC from Sullivan & Cromwell, counsel for the then 11 member NYCHA. The letter stated that "the FDIC assessment base should include no more than the net amount of CHIPS payments on a bank-by-bank basis. . . ." Plaintiff's Exh. 19. That same week the 11 members of the NYCHA submitted letters to the FDIC concurring in the opinion of the association's counsel. Plaintiff's Exh. 21. On April 20, 1979, the FDIC wrote the NYCHA that "our Legal Division has decided that it is proper for the Association members to report, for assessment purposes, only the "net" amount of transfers through CHIPS on a bank-by-bank basis." Plaintiff's Exh. 23.

EAB says it was not party to the discussions of what the proper basis for assessment should be since it was not a member of the NYCHA until January 16, 1979.

---

2. Settling participants settle by entry against their accounts at the Federal Reserve Bank of New York. Non-settling participants meet their net-net obligations by making payments to the settling participants that have been designated to settle for them.

3. EAB and other CHIPS participants were able to afford customers this additional time because the CHIPS participants themselves did not have to settle until 10:00 A.M. on Day 2.

4. Since October 1, 1981, although the mechanism for sending payment messages has remained the same, settlement now occurs on the same day that payment messages are released and received and these particular credit-debit notations are no longer necessary. Of course the change in settlement practice has also eliminated any dispute about whether CHIPS transactions are properly classified as "deposits"; under the current system, CHIPS transactions do not constitute deposits.

Nevertheless, EAB sent representatives to the meetings where the assessment issue was discussed. In addition, although EAB claims it was not informed of the FDIC's decision to continue to make assessments on a net bank-by-bank basis, the NYCHA circulated the April letter from the FDIC, explaining the FDIC's decision, to all NY-CHA members, including EAB.

*Determination*

1. *The Standard of Review*

The first question confronting the Court is what is the proper standard of review of the agency's action. In a recent case, *Federal Election Commission v. Democratic Senatorial Campaign Commission*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981), the Supreme Court provided the answer. The Court wrote that a reviewing Court's role

> was not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commission's construction was "sufficiently reasonable" to be accepted by a reviewing Court.... To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

Moreover, the FDIC's decision warrants deference for several additional reasons. "First, the [FDIC] is 'the type of agency to which deference should presumptively be afforded' because of *the scope of its authority*." *A.G. Becker Inc. v. Board of Governors*, 693 F.2d 136, 140 (D.C.Cir. 1982) (emphasis in original). Second, deference is due the FDIC because of "its *expert knowledge of commercial banking*." *Id.* (emphasis in the original). Third, recognizing that the relevant statute was passed before the advent of computerized banking, the Court should respect the agency's efforts to adapt statutory language to new developments. "[W]e cannot assume that Congress intended the [definition of deposit] to comprise a set of rigid and unchanging categories." *Id.* Statutory definition "leave[s] the agency with the task of evolv-

ing definitions on a case-by-case basis." *Puerto Rico v. Blumenthal*, 642 F.2d 622, 635 (D.C.Cir.1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981).

■ EAB nevertheless argues that the FDIC's interpretation of the term "deposit" does not warrant deference since the agency did not engage in sufficiently thorough analysis of the matter before it made its formal interpretation of the statute. A review of the record, however, especially Plaintiff's Exhibits 17–30, demonstrates, on the contrary, that the FDIC spent a great deal of time studying the matter—taking into account the views of the banks and examining the implications of its interpretation—before issuing its interpretation.

■ EAB also contends that the Court should not defer to the agency's action because FDIC has interpreted the statute inconsistently. EAB claims that CHIPS banks have followed a variety of reporting practices over the twelve years of CHIPS existence, and that the FDIC acquiesced in diversity for most of that period. There is no indication in the record of such acquiescence on the FDIC's part. In every instance in which the FDIC found that a bank was not reporting on a net bank-by-bank basis it objected to the bank's deviation from FDIC policy. In the case of EAB itself, the FDIC noted a problem with EAB's method of reporting in its 1978 audit reports.

For these reasons, the Court concludes that the agency's construction of the statute was "sufficiently reasonable" to be accepted as an appropriate reading of the statute by this Court. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm'n, supra*, 454 U.S. at 39, 102 S.Ct. at 46.

2. *CHIPS Transactions are Deposits 12 U.S.C. § 1813(l)(1)*

Specifically, the FDIC argues that a CHIPS release satisfies three of the FDI Act's definitions of deposit, 12 U.S.C. § 1813(*l*)(1), (3), and (4). The first of these states that a deposit is:

the unpaid balance of money or its equivalent received or held by a bank in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally to a commercial, checking, savings, time or thrift account ... *Provided*, that, without limiting the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued ... for a charge against a deposit....

12 U.S.C. § 1813(*l*)(1). The FDIC argues that a CHIPS release satisfies this subsection's three requirements: (1) that it be an unpaid balance of money held by a bank, (2) that the bank hold it in the usual course of business, and (3) that the bank be obligated to give credit on it to a commercial or other account.

With regard to the first criterion, the key point of contention between the parties is the significance of the fact that funds covering the release message are not physically held by the bank on the day the messages are analyzed and the assessments against the bank are calculated. The EAB relies heavily on this fact in arguing that the statute's wording excludes CHIPS transactions from the definition of deposits, since money is not "received or held." The FDIC emphasizes, nevertheless, that the CHIPS transfer represents an unpaid balance of money or its equivalent held by the bank. The latter argument is persuasive.

██ As the FDIC points out, CHIPS transactions represent an irrevocable and unpaid obligation to pay the CHIPS participant to which the payment message has been released. As a result, when EAB transmits a release message, until settlement that message represents an unpaid balance. Since EAB debits or charges the account of the requesting party in making the release, under the statute the unpaid balance can be considered "money or its

equivalent" received or held by EAB. Whether or not EAB refers to the debit as "deferred," EAB makes the debit on the same day as the CHIPS release and the money covering a release is available to it, at least it could be, until the next day when settlement occurs.[5] This brings the transaction within the statutory definition at issue here.

In addition, contrary to EAB's assertions, the unavailability or uncollectability of a certain portion of a bank's deposit liabilities is not decisive in determining whether funds can be considered deposits. The 1960 Amendments to the FDI Act built into the statute an automatic allowance for funds which are not collected by the bank on the same day. 12 U.S.C. § 1817(b)(6)(C) and (b)(8). A bank is now entitled to take a flat 16⅔ percent deduction of its adjusted demand deposits (the "float" deduction), with adjustments specified in the statute. In asserting that CHIPS transactions do not qualify as deposits because money or its equivalent is not physically delivered to the bank, EAB, in effect is claiming a 100 percent deduction. Since Congress created the float deduction to avoid cumbersome individual determinations by each bank, the Court must reject EAB's attempt to circumvent the float provision.

The second criterion under the statutory definition of deposit is whether the money, or its equivalent is held in the "usual course of business." The FDIC's argument is that the size and volume of the daily transfers through the CHIPS system is evidence of the importance and regularity of these transactions for all NYCHA banks, including EAB. EAB, on the other hand, points to the fact that only ²⁄₁₀ of 1 percent of all insured banks are CHIPS participants.

In highlighting the small percentage of the nation's thousands of banks that engage in CHIPS transactions, EAB fails to mention that the participants in CHIPS are the superbanks, and that when non-partici-

---

**5.** As the FDIC argues, how or why EAB elected to send CHIPS releases without adequate "cover," and thereby create an overdraft on some occasions, is irrelevant to the question of whether CHIPS payments constitute deposits.

pating banks need to transfer money through CHIPS, the large banks participating in CHIPS do it for them. Reference to *FDIC v. Continental Illinois Bank & Trust Co.*, 245 F.2d 567 (7th Cir.), *cert. denied*, 355 U.S. 877, 78 S.Ct. 142, 2 L.Ed.2d 108 (1957), does not strengthen EAB's position in this regard. That case discussed the fact that only a small percentage of banks carried a certain type of deposit account, and that, therefore, the account itself could not be considered part of the usual course of business of banking. On the facts of this case, it is obvious that the same conclusion cannot be reached. As EAB itself concedes, CHIPS is the world's principal system for interbank dollar payments and on the average day billions of dollars are cleared through the system. Moreover, CHIPS is only one of several electronic fund transfer systems that handle large dollar amount, bank-to-bank electronic fund transfers. *N. Penney & D. Baker, The Law of Electronic Fund Transfer Systems*, ¶ 9.01 (1980). Wholly unlike the type of account discussed in *Continental Illinois Bank & Trust Co., supra,* CHIPS is a pervasive and important aspect of modern day banking and seems to be very much a part of the usual course of the banking business.

The third definition of what is a deposit—that the bank be obligated to give credit for the money held to a commercial or other account—is also satisfied by the handling of CHIPS transactions. When a bank makes a CHIPS release on Day 1, it does so with a customer's money and is obligated to give credit for that money to the account designated by the customer. That account, more often than not, will be a commercial account.

That EAB credits to an account called "Due From CHIPS" on the day it makes the release does not destroy this basic link between the release and the credit to a commercial account. The important point is that once EAB makes a release, it is under a firm obligation to credit a commercial account or one of the other types of statutorily enumerated accounts. Even *Continental Illinois, supra,* on which

EAB relies, recognized that the existence of such an obligation was key. An account was not to be considered a commercial account, the Court wrote, simply because it arose out of a commercial transaction. A bank must have some liability at the inception of a credit to the account in question. *Id.* at 575. EAB's irrevocable obligation at the inception of its CHIPS release to the account designated by its customer fulfills this requirement.

For all these reasons, a CHIPS release falls within the first definition in 12 U.S.C. § 1813(*l*).

### 12 U.S.C. § 1813(l)(3)

The FDIC next submits that CHIPS transactions fall under the third subparagraph of § 1813(*l*), which states that a deposit is:

> money received or held by a bank, or the credit given for money or its equivalent received by a bank, in the usual course of business for a special or specific purpose, regardless of the legal relationship thereby established, including *without being limited to,* escrow funds, funds held as security for an obligation due to the bank or others (including funds held as dealers reserves) or for securities loaned by the bank, funds deposited by a debtor to meet maturing obligations, funds deposited as advance payment on subscriptions to United States Government securities, funds held for distribution or purchase of securities, funds held to meet its acceptances or letters of credit, and withheld taxes....

(Emphasis supplied).

Arguing that CHIPS transactions fall most clearly within this particular definition of deposit, the FDIC repeats its argument that when a CHIPS release is made, the bank has already "received" money and holds that money "in the usual course of business." The FDIC now adds that the money is held "for a specific purpose," to wit, to pay the recipient of the CHIPS release. The FDIC stresses the language in the subparagraph, "without being limited to." This clause means, it argues, that

the subparagraph does not specify each and every purpose for which money may be held to qualify as a deposit. The FDIC urges the Court to read this subparagraph expansively.

EAB would prefer a narrow reading. In addition to repeating that there is no "money received or held," and that none of this is done in the usual course of business, EAB contends that this subparagraph applies only to money held for such specific purposes as escrow accounts and security funds, delineated in the statutory language, but not to a CHIPS release.

■ The fact that the section states that the specific purposes for which money may be held are not "limited to" the specific purposes enumerated makes it impossible for the Court to read the subparagraph as narrowly as EAB suggests. The money covering a CHIPS transfer certainly has as specific a purpose as the money in the accounts listed by the statute. Just like money deposited to meet maturing obligations, for example, money backing a CHIPS release is to insure payment to the recipient of the release. In addition, as discussed above, the money covering a release is "money received" by a bank and the money is held "in the usual course of business." Thus all three of the subparagraph's criteria are satisfied.

The FDIC's reading of the statute is a "sufficiently reasonable" interpretation of its language, and its conclusion that CHIPS transfers are deposits under this subparagraph is upheld.

### 12 U.S.C. § 1813(l)(4)

The FDIC also argues—but seemingly with little conviction—that CHIPS payments fall within a third definition of the FDI Act. Subparagraph (4) of Section 1813(l) states that a deposit may be an

> outstanding draft (including advice or authorization to charge a bank's balance in another bank), cashier's check, money order, or other officer's check issues in the usual course of business for any purpose, including without being limited to those issued in payment for services, dividends, or purchases.

This definition obviously applies to cashier's checks and other officer's checks, that is to say, checks drawn on the bank itself, checks that a bank guarantees to pay. In urging that CHIPS payments be found to fall within the definition of subparagraph (4), the FDIC is stretching the language beyond what Congress intended.

■ When a bank makes a CHIPS release, it is neither guaranteeing the payment that a customer is ordering, nor is it drawing a check on itself. In making a CHIPS payment, a bank is merely following a depositor's order to transfer money to another party. Even though the CHIPS system may have been "specifically created to replace cashier's checks as a means of interbank payments of large amounts," *Delbrueck & Co. v. Manufacturer's Hanover Trust Co.*, 609 F.2d 1047, 1050 (2d Cir.1979), this does not mean that every single one of the thousands of CHIPS transfers a bank makes, nor indeed most of them, are analogous to cashier's checks or checks of bank officers. The FDIC's failure to show that a CHIPS payment is not a deposit under subparagraph (4) is not fatal to its motion for summary judgment, however, because it has already demonstrated that such payments fall within the ambit of subparagraphs (1) and (3).

EAB, *citing Continental Illinois, supra* at 520, contends that CHIPS releases are not deposits because they are no measure of a bank's strength and do not increase the bank's earning power. EAB also espouses what it calls a "disparate impact theory," arguing that the FDIC's system of assessing electronic fund transfers as deposits is especially unfair to it inasmuch as the ratio of its total CHIPS transactions to its assets is far greater than that of other banks. Neither argument is based on statutory criteria; both merit only brief discussion.

EAB's conjuration of the language in *Continental Illinois* has little value here; even were we to treat the Seventh Circuit's general characterization of the nature of deposits as law, that law would pose no barrier to the FDIC's treatment of CHIPS transactions as deposits. In *Continental Illinois*, it was held that reciprocal depos-

its, there at issue, were solely for the convenience of the banks involved and their customers, that they added nothing to the earnings of the bank. That is not the case here. As the FDIC has pointed out, EAB could use the sizeable float available to it for investment, producing considerable income. Apparently some CHIPS participants have earned almost $90,000 in interest on a $100 million transfer by using an arbitrage technique involving the manipulation of float by buying and selling foreign currencies in different markets.[6]

EAB's disparate impact argument is equally unpersuasive. Had EAB been informed earlier of the deposit base from which the FDIC would make assessments, it says, it would have circumvented the FDIC by requesting its customers to make future CHIPS transactions through EAB's noninsured affiliate. Thereby, EAB claims, it could have reduced vastly its deposit base for assessment purposes, putting itself in parity with the substantial majority of other CHIPS participants who handle their transactions in this way. That EAB could have avoided the impact of the FDIC's assessments does not demonstrate that banks handling a sizeable amount of CHIPS transactions should have been granted, in deference to their size, an exemption from the statutory definition of deposits. On the contrary, Congress made clear that the FDI Act's definition of deposit is not keyed to bank size. *See Federal Deposit Ins. Corp. v. Irving Trust Co.*, 137 F.Supp. 145, 156 (S.D.N.Y.1955) (McGohey, J.).

### 3. *The Appropriate Basis for Assessing CHIPS Payments*

The second major issue raised here is the propriety of the FDIC's method of making assessments of CHIPS payments. EAB argues that the FDIC's net bank-by-bank basis is inappropriate and that only a net basis assessment is correct.

■ The FDIC's determination to assess CHIPS payments on a net bank-by-bank

basis is clearly reasonable. The FDIC made its determination after discussions with the NYCHA, and after consideration of the NYCHA's counsel's opinion. It achieved agreement among CHIPS participants and support from the NYCHA for the net bank-by-bank method. More to the point, EAB tells this Court nothing that belies the reasonableness of this method. Net on a bank-by-bank basis of course creates a higher assessment base and, therefore, higher assessments. This does not, however, make it unreasonable.

The Court finds that both ways of assessing CHIPS transfers appear reasonable and acceptable. Because, "where different interpretations of a statute are reasonable and consistent with the Act, we are required to defer to the [agency's] interpretation of the statute ... rather than substitute our own judgment for that of the agency." *Council Of Commuter Organizations v. Gorsuch*, 683 F.2d 648, 658 (2d Cir.1982). Accordingly, the FDIC's choice of net on a bank-by-bank basis must be upheld.

■ Two minor points must yet be addressed. First, EAB asserts that it should not be assessed for its underpayment on the ground that the FDIC was allegedly slow to inform it that it was supposed to report on a net bank-by-bank basis. This is a species of estoppel or laches argument. It fails in this context. Barring a showing of "affirmative misconduct" by the federal government, the doctrine of estoppel cannot be invoked against it, *Immigration and Naturalization Service v. Miranda*, — U.S. —, —, 103 S.Ct. 281, 282, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen*, 450 U.S. 785, 790, 101 S.Ct. 1468, 1471–72, 67 L.Ed.2d 685. (1981), and "the United States is not ... subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *see also United States v. 93 Court Corporation*, 350 F.2d 386, 388 (2d Cir.1965).

---

**6.** On a typical $100 million transfer, where one day deposits earned 16% annual interest, arbitrage provided an additional $87,671 in interest.

*See Business Week* at 6 (March 23, 1981); *American Banker* at 1 (December 14, 1977).

■ Lastly, EAB argues that the statute of limitations bars the FDIC's claim for payment for the six-month period, July 1 to December 31, 1976. The statute of limitations section of the Act, 12 U.S.C. § 1817(g), states:

> No action or proceeding shall be brought for the recovery of any assessment due to the Corporation ... unless such action or proceeding shall have been brought within five years after the right accrued for which the claim is made....

Under the Act, the semiannual payment is not due until "the last day of the first month following each semiannual period." 12 U.S.C. § 1817(c)(1). Because the assessment payment for the July 1 to December 31, 1976 period was not due until January 31, 1977, and because the FDIC brought this suit on January 29, 1982, the FDIC's claim for the July through December, 1976 period is not barred by the statute.

For the foregoing reasons, the FDIC's motion for summary judgment is granted, and EAB's counterclaim is denied.

IT IS SO ORDERED.