SEATTLE–FIRST NATIONAL BANK, a national banking association, Plaintiff,

v.

The FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity and as receiver of Penn Square Bank, N.A.; and Deposit Insurance National Bank, a national banking association, successor to Penn Square Bank, N.A., Defendants.

No. CIV 82–1385–R.

United States District Court, W.D. Oklahoma.

Oct. 15, 1985.

George W. Dahnke, Hastie & Kirschner, Oklahoma City, Okl., for plaintiff.

Charles C. Baker, Oliver S. Howard and Sidney G. Dunagan, Gable & Gotwals, Tulsa, Okl., for defendants.

## ORDER

DAVID L. RUSSELL, District Judge.

This lawsuit is one of several loan participation suits arising in the wake of the declared insolvency and receivership of Penn Square Bank, N.A. Plaintiff here, Seattle-First National Bank ("Seafirst") is suing the Federal Deposit Insurance Corporation in FDIC's dual capacities as Receiver for Penn Square and as the Corporation in charge of deposit insurance. Seafirst complains in Count I of the Receiver's offsets against approximately $3.8 million in participated loans; in Count II it claims deposit insurance from the Corporation for $1.2 million in mistakenly wired funds; in Count III it seeks reimbursement from the Receiver of $12 million paid by Seafirst on Penn Square letters of credit; and in Count IV it claims deposit insurance on its asserted interest in approximately $1.74 million in Penn Square letters of credit issued in conjunction with participated loans. The case is before the Court on the Receiver's motion to dismiss Count I (concerning offsets), the Corporation's motion to dismiss Counts II and IV (for deposit insurance), and the Receiver's and the Plaintiff's cross motions for summary judgment on Count III (concerning the wired funds).

### OFFSETS

### Count I

Prior to its insolvency, Penn Square originated and participated loans to "upstream" banks such as Seattle First. Subsequently, in the course of the receivership, the FDIC offset the balances contained in deposit accounts maintained by Penn Square's borrowers against the balances due on the borrowers' participated loans. Seafirst was issued Receiver's certificates in proportion to Seafirst's stake in the offsets. Seafirst will take its share of the remaining loan payments in "new money" paid by the borrowers to the Receiver. The mechanics of offset are elaborated in *Chase-Manhattan Bank, N.A., v. FDIC*, 554 F.Supp. 251, 253 (W.D.Okla.1983).

Seafirst claims that the terms of its participation agreements with Penn Square conferred "property rights" or "trust estates" in the loans and their collateral. According to this theory, the offset amounts constituted a "separate fund" augmenting the Receiver's estate, thereby qualifying for preferred receivership distributions. In considering this argument, the Court must determine both the existence and the consequence of Seafirst's asserted interests in the participated loans. The nature and extent of these interests derive from the participation agreement between Seafirst & Penn Square which was signed sometime during March, 1982. It reads as follows:

### "PARTICIPATION AGREEMENT

"This Participation Agreement is entered into this _____ day of March 1982, by and between PENN SQUARE BANK N.A., of

Oklahoma City (hereinafter called Seller) and SEATTLE–FIRST NATIONAL BANK (Hereinafter called the Purchaser).

"1. *Sale of Participations.* Seller hereby agrees to sell and Purchaser agrees to purchase participations in the loans described on Exhibit A attached hereto and by this reference incorporated herein. The amount of Purchaser's participation in each loan is also indicated on Exhibit A. The transfer from Seller to Purchaser of Purchaser's interest in each loan shall be evidenced by a Certificate of Participation in form marked Exhibit B attached hereto and by this reference incorporated herein. To the extent the terms of this Agreement vary from or are in conflict with the terms of any certificate, the terms of this Agreement shall control.

"2. *Owner Trustee.* To the extent of its participation in the loans, Purchaser shall be the owner of an undivided fractional interest in each such loan, including, but not limited to, all notes and other instruments evidencing indebtedness of the borrower, together with all collateral securing such indebtedness. To the extent of Purchaser's interest therein, including, but not limited to, its pro rata share of all funds and payments received and/or to be received by Seller from the borrowers, Seller shall be a trustee for the benefit of and accountable to Purchaser, and shall hold all such notes, mortgages, and collateral security instruments together with all such funds and payments in trust for Purchaser for its sole and exclusive benefit.

"3. *Administering and Servicing.* Seller shall, at its sole cost and expense, manage and service the loans and maintain all necessary books and records with respect thereto. Seller will deliver with each participation certificate a true and correct copy of the note and all other instruments evidencing the loan indebtedness together with security agreements, mortgages, trust deeds and other security instruments. Seller shall also furnish Purchaser with evidence of the perfection of Seller's lien. Seller shall receive and collect all payments of principal and interest that become due and payable on the loans and shall immediately place all such funds in a reserve account as soon as the same are collected, to be held for disbursement as provided below.

"Seller agrees that it will consult with Purchaser on any matter that may affect Purchaser's interest in the loans and agrees that, without Purchaser's prior written consent, Seller will not (a) modify or waive any of the terms of the loan documents or give or withhold consents or approvals to any action or failure to act by the borrower; (b) permit substitutions or withdrawals of security, if any, which would materially reduce the value thereof without a proportionate reduction in the loan. Seller agrees to exercise the same degree of care in administering the loan as Seller exercises with respect to loans in which no participations are sold.

"4. *Marking of Records, Inspection.* Seller represents, warrants, covenants and agrees to mark all notes, mortgages, security agreements, trust deeds and other instruments evidencing the loans and the collateral securing same, in a conspicuous manner so as to clearly identify Purchaser's participation in the loans and further agrees to mark all credit files, ledgers and/or computer printouts and other records pertaining to the loans. Purchaser may at any reasonable time or times have the right to inspect and make copies of any and all records of Seller pertaining to the loans.

"5. *Monthly Reports.* Not later than ten days following the end of each month in which Purchaser has a participation interest in any loan hereunder, Seller shall transmit to Purchaser a computer printout or report on which Seller will indicate with respect to the immediately preceding month:

(a) The total amount of each loan outstanding at the beginning of such immediately preceding month;

(b) The aggregate amount of payments segregated as to principal and interest made by the borrower on each loan during each month;

(c) The total amount of each loan outstanding at the end of such month;

(d) The total amount of Purchaser's participation in each loan outstanding at the beginning and end of such month.

"6. *Payments.* Seller will pay to Purchaser its pro rata share of the aggregate amount of payments of principal and interest paid by the borrower during each month when received.

"7. *Representations and Warranties of Seller.* Seller represents and warrants to Purchaser as follows:

(a) Each loan and the loan documents evidencing same, including any note, mortgage, security agreement, trust deed, guaranty (and other instruments pertaining to the loan) have been prepared, executed and delivered in conformity with applicable laws and regulations and constitute the legal, valid and binding obligations of the borrower (and the guarantor where applicable).

(b) All liens running in favor of Seller to secure the loan have been properly perfected so as to constitute valid and enforceable first liens upon the collateral (except as otherwise specifically allowed under the loan documents).

(c) The borrower has good title to the property given as collateral security for the loan free and clear of liens and encumbrances except as specifically described in the loan documents.

(d) The amount due and owing Seller under each loan is as stated in the loan documents and there are no defenses, offsets or counterclaims against Seller with respect to the amounts owing.

(e) There has been no material adverse change in the condition of the borrower under the note since the note was executed except as otherwise specifically disclosed to the Purchaser in writing.

(f) Except as specifically disclosed in the loan documents, all collateral given for the loan is duly insured at all times against such risks as are normally insured against in the industry of the borrower with loss payable in favor of Seller in an amount not less than that of the outstanding balance of the loan.

"8. *Costs.* Seller agrees to pay all costs and expenses incurred in connection with making, managing, servicing and collecting the loans or realizing upon the collateral securing the loans including any and all attorneys' fees and court costs.

"9. *Instructions.* Seller agrees that so long as the Purchaser's share in the loan is more than 50 percent thereof, then the Seller will take any action as may be requested by Purchaser to enforce the terms thereof, or to exercise the rights given in the loan documents relating to or evidencing the loan or the security therefor provided Purchaser first indemnifies Seller against Purchaser's pro rata share of any expense or liability which Seller may incur in so doing.

"10. *Resale.* Purchaser may assign or transfer in whole or in part its interest in any loan or loans or may sell subparticipations therein.

"IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

PENN SQUARE BANK, N.A.

By _____

SEATTLE–FIRST NATIONAL BANK

By _____ "

The agreement governed the relation between Seafirst and Penn Square (*Franklin v. Commissioners of Internal Revenue,* 683 F.2d 125, 128 (5th Cir.1982)) and expressly pre-empted any conflicting terms of individual participation certificates for specific loans.

(The certificates executed by the parties were identical to those considered by the 10th Circuit in *Hibernia National Bank v. FDIC, et al.,* 733 F.2d 1403 (10th Cir.1984) and by this Court in *Chase Manhattan v. FDIC,* and Northern Trust. They presented a far weaker picture of Seafirst's interests than the overall agreement contains; in fact, both *Hibernia* and *Chase* held that the certificates' terms were insufficient to create a participant bank's "property interest" in loan and collateral proceeds.)

The Court finds that the agreement arguably created and conveyed property rights in the participated loans. Although

the agreement refers to Seafirst as the "owner" of a fractional interest in the loan, Seafirst acquired nothing more through its participation than an expectation of the borrower's repayment. Penn Square as lead bank remained the sole secured party in the borrower's collateral, the exclusive manager of the loan, and "the only party empowered to collect (the loan) since the lead is the only party to whom it is owed." A. Armstrong, "The Developing Law of Participation Agreements", 23 Banking Law Journal 689 (April 1968). *See generally*, Hutchins, "What Exactly is a Loan Participation?" 9 Rut-Cam.L.J. 447 (1978) (suggesting various legal analyses of participation relationships). The Court concludes that the language in the agreement is ambiguous as to the existence of both property interests and trust relations. *Philadelphia Gear v. FDIC*, 751 F.2d 1131, 1139 (10th Cir.1984).

A trust relation is suggested by the caption and terms in section 2 declaring that Penn Square "shall be a trustee for the benefit of and accountable to" Seafirst regarding its pro rata share of participated loans; by the terms in section 3 requiring that Penn Square immediately place all principal and interest payments on participated loans into a reserve account for disbursement to Seafirst, and by the requirement binding Penn Square to consult Seafirst before modifying the loan's terms or altering the collateral.

On the other hand, the first paragraph of section 3 indicates that Penn Square remains sole manager of the loans and collateral; paragraph 7 represents Penn Square, not Seafirst, as the sole secured party; and paragraph 9 indicates that while Penn Square will defer to Seafirst's requests regarding enforcement or foreclosure of security interests in participated loans, Penn Square is entitled to indemnity from Seafirst for "any expense or liability" incurred in so doing. These terms suggest that Penn Square retains the status of primary creditor and secured party.

■ In *Stratford Financial Corp. v. Finex Corp.*, 367 F.2d 569 (2nd Cir.1966) the district court found that a loan partic-

ipation constituted a trust relationship, based upon the parties' past transactions, the participants' commercial dependence on the originating institution, and the express trust language drafted by the lead. *Stratford Financial Corp.* was decided in the context of an appeal from a bankruptcy case. We know of no federal case authority outside of bankruptcy establishing an inter-bank trust relationship in a commercial loan participation. To the contrary, we note as a general rule that banks engaging in commercial arms length transactions with each other are generally not held to a fiduciary standard. *Aaron Ferer and Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 122–123 (2nd Cir.1984); *In Re Colocotronis Tanker Securities Litigation*, 449 F.Supp. 828, 833 (S.D.N.Y.1978). *See Barclay's Bank D.C.O. v. Mercantile Nat'l Bank*, 481 F.2d 1224, 1235 (5th Cir. 1973); *cert. dism'd.* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974) (banks in commercial undertaking entitled to assume each other's competence in own affairs). *Contrast* M. McDonald, Loan Participations As Enforceable Property Rights in Bankruptcy, etc., 53 Amer.Bankrtcy. LJ 35 (1979).

■ As further authority for its argued trust interest, Seafirst cites portions of the Receiver's manual concerning the segregation of accounts. Administrative directions contained in the Receiver's Manual do not constitute a foundation for a trust. The Manual was not incorporated into the participation agreement; it was issued only for internal operating purposes of the FDIC and is not a predicate for liability to third parties. *First State Bank of Hudson County v. U.S.*, 599 F.2d 558, 564 (3rd Cir.1979), cert. den. 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980).

The finding of a possible property interest and/or trust relation, however, does not end the inquiry into offsets; it merely brings us to the second prong of our consideration, *viz*, the legal import of such an interest. Even if Seafirst prevails on its property or trust theory, the Receiver can prevail on its motion to dismiss Count I if it

proves beyond doubt that the offsets were nonetheless proper.

■ The general rules/regarding setoffs between a bank and its borrower establish several prerequisites. First, the funds deposited must have been the property of the debtor. Second, the funds must be deposited without restriction and must not be a special fund. Third, there must be an indebtedness then due and owing by the debtor to the bank. Finally, and closely related to the third prerequisite, the deposit must have created the relationship of debtor and creditor between the bank and depositor, thereby creating mutuality of indebtedness between the bank and depositor. J. TeSelle, "Banker's Right of Setoff" 34 Okla.L.Rev. 40, 42 (1981). It is the third factor which is crucial here: we must determine whether under the terms of the participation agreement, there remained "an indebtedness due and owing by the debtor" to Penn Square. If the Bank retained creditor status, then the mutuality requirement is satisfied and offset is proper. *Navajo Tribe v. Bank of New Mexico,* 700 F.2d 1285, 1289 (10th Cir.1983).

■ Mutuality requires that the parties each occupy the relation of debtor and creditor on reciprocal demands. 5A Michie on Banks and Banking (1983); *Bulasky v. FDIC,* 442 F.2d 341 (9th Cir.1971). Insolvency alone does not negate creditor or debtor status. An insolvent bank may retain deposits at the time of its failure "as an equitable setoff against the depositor on his paper held by the bank." 5A Michie § 115b at 364. The crucial concern is not whether Penn Square's creditor status survived its insolvency but whether its creditor status survived the participation agreement.

The Receiver argues that since the borrower's deposit account is extinguished by the offset, there is no "res" in which Seafirst can assert a property interest. This argument begs the question, however, of whether offset is precluded by participation of the depositor's loan. If the depository bank is no longer also the lending bank, then there is no reciprocity (or mutuality) of obligations between the bank and its customer.

■ Mutuality is measured by federal standards because of the need for uniformity and coherence in national bank receiverships. (*FDIC v. Mademoiselle,* 379 F.2d at 662; *Jones v. FDIC,* 748 F.2d 1400 (10th Cir.1984)). *Board of Education of Ringling v. State ex rel Benton,* 172 Okl. 437, 46 P.2d 325 (1935), cited by Seafirst, is therefore legally as well as factually distinguishable. The *Ringling* case involved a local board of education's attempt to offset its state bank deposit account, which had not yet matured, against claims by the bank's assignee of the board's fund-raising warrants. *Ringling* was expressly recognized as an action at law, governed by the state Code of Civil Procedure, 46 P.2d at 327. None of the other state law assignment and setoff cases cited by Seafirst involve bank loans and deposits, and none are on point (*McMann v. H.F. Wilcox Oil & Gas,* 120 Okl. 167, 250 P. 780 (1926); *Sisler v. Sapulpa Ind. Fin. Corp.,* 172 Okl. 207, 45 P.2d 91 (1935)).

■ Under the terms of the agreement, Penn Square remained the manager, sole secured party and sole authority for collection on the loan. There is no evidence of a multi-lender agreement or any other instrument conferring direct creditor status on Seafirst. The Court finds as a matter of law that Penn Square retained sufficient creditor status to satisfy mutuality and effect offset. *New York Guardian Mortgage Corp. v. Cleland,* 473 F.Supp. 422 (S.D.N.Y.1979) (originating lenders, not mortgage pool issuers, remained beneficial owners of mortgages for purposes of mutuality and offset).

(It is questionable whether this conclusion would extend to loans participated after April 14, 1983, the effective date of federal regulations excluding certain participated loans from a bank's legal lending limit. 12 C.F.R. § 32.107. The argument that exclusion from lending limits affects the bank's creditor status has not been made in this case.)

■ The guiding precept in our decision continues to be the borrower's right to offset, (*Scott v. Armstrong*, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892); *Chase Manhattan*, 554 F.Supp. at 254) which is an equitable right surviving participation. The borrower's knowledge of his loan's participation is irrelevant to his continuing equitable claim. (*Chase Manhattan*, 554 F.Supp. at 255). So long as the borrower maintained a bona fide deposit account and sufficient mutuality existed, the borrower's equitable interests in setoff are superior to the interests of the participant bank. To hold otherwise would subject a depositor to unforeseeable jeopardy when his "home" banking institution commercially peddled his loans to banks against whom they had no direct recourse. The fact that the loan was participated "does not deprive the depositor of his right to a set-off." *FDIC v. Mademoiselle*, 379 F.2d at 663.

There is, in addition to the borrower's equitable rights, the Receiver's statutory right of setoff. (12 U.S.C. § 1822(d); Okla. Stat.Anno. tit. 42 § 32; *see Northern Trust v. FDIC*, 619 F.Supp. 1340 (W.D.Okla. 1985).) A bank's equitable claim to setoff has been recognized also. 5A Michie § 115b; *Messick v. Rardin*, 6 F.Supp. 200, 202 (E.D.Ill.1934).

The Court concludes as a matter of law that the challenged offsets were proper, notwithstanding any property or trust interests conveyed to Seafirst, because mutuality between Penn Square and the borrowers survived the participation agreement.

Arguably, the offsets impaired Seafirst's property rights in the expected repayment of its share of participated loans. However, the "ownership interest" acquired by Seafirst through participation was merely its share of an expectation generated, managed, enforced and collected by the lead bank, Penn Square. Seafirst took this interest subject to the borrower's and the bank's rights of offset. Absent terms in the participation agreement barring the assertion of such offsets, they remained enforceable by either the borrower or the bank.

From an equitable standpoint, enforcing an offset against a participated loan entails balancing benefits and hardships among at least three parties: the borrower, the lead bank, and the participant(s). These permutations are compounded when insolvency is an added factor and the Court readily admits to frustration, and perhaps impossibility, in striking a balance satisfactory to all parties. The Court concludes that it is sufficient to resolve the claims in favor of the borrowers and the lead bank (so long as a sufficient basis for mutuality exists), leaving participant banks to bear the market risk of their participation ventures. To charge participants with responsibility for investigating the creditworthiness and solvency of both the lead banks and their borrowers is consistent with banking policies announced by the Comptroller of the Currency in its guidelines for loan participations, infra.

## ·WIRED FUNDS

### Count II

*Claim For Deposit Insurance*

In order to fund its share of the borrower's draw on a certain participated loan, Seafirst wired $1.2 million dollars to Penn Square, via the Federal Reserve Bank in Kansas City. The borrower cancelled its request after Seafirst had already dispatched the wire transfer. Seafirst's incoming share of the cancelled draw was held by Penn Square in a "wire suspense account." Seafirst describes the wired amount as its "special fund" or "deposit," while the Receiver maintains that the wire transfer had no separate legal identity and became part of a general ledger account at Penn Square where funds were freely comingled. In Count II, Seafirst claims deposit insurance, or alternatively a preferred claim for the entire amount of the wired funds.

The scope of federal deposit insurance coverage is statutorily defined at 12 U.S.C. § 1813. For present purposes, the Court focuses on §§ 1813(*l*)(1) and 1813(*l*)(3), which state in pertinent part as follows:

(1) The term *"deposit" means— the unpaid balance of money or its equivalent received or held by a bank in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account,* or which is evidenced by its certificate of deposit, or a check or draft drawn against a deposit account and certified by the bank, or a letter of credit or a traveler's check on which the bank is primarily liable: Provided, that without limiting the generality of the term "money or its equivalent", any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for checks or drafts or for a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable, or for a charge against a deposit account, or in settlement of checks, drafts, or other instruments forwarded to such bank for collection.

\*   \*   \*   \*   \*   \*

(3) *money received or held by a bank, or the credit given for money or its equivalent received or held by a bank, in the usual course of business for a special or specific purpose, regardless of the legal relationship thereby established,* including without being limited to, escrow funds, funds held as security for an obligation· due to the bank or others (including funds held as dealers reserves) or for securities loaned by the bank, funds deposited by a debtor to meet maturing obligations, funds deposited as advance payment on subscriptions to United States Government securities, funds held for distribution or purchase of securities, funds held to meet its acceptances or letters of credit, and withheld taxes: *Provided, that there shall not be included funds which are received by the bank for immediate application to the reduction of an indebtedness to the receiving bank,* or under condition that the receipt thereof immediately reduces or extinguishes such an indebtedness, ... (emphasis supplied)

Federal regulations at 12 C.F.R. 330.1 et seq. do not illuminate the issue of whether funds wired as loan advances by a participating bank constitute insured deposits, nor has the Court discovered any authority directly on point.

The parties do not argue the sufficiency of the Fed's advice of debit and credit under 12 C.F.R. § 210.34; they do not mention any attempt by Seafirst to revoke the wire transfer according to terms of 12 C.F.R. § 210.35(a); nor do they address the "final payment" criteria in 12 C.F.R. § 210.36(a). Therefore, the Court will assume that "final payment" on the wire transfer occurred without Seafirst's objection. The parties are similarly silent as to the Federal Reserve Bank's authority to intercept a wire transfer and apply it to an existing deficiency in the transferee's Federal Reserve account, effectively offsetting the wired funds against the recipient's negative balance with the Fed. On the basis of this silence, we conclude that there is no dispute that the wired funds were "finally paid" by Seafirst through the Federal Reserve Bank to Penn Square.

In *FDIC v. European American Bank & Trust Co.,* 576 F.Supp. 950, 954–957 (S.D.N.Y.1983) the district court held that interbank electronic transfer orders constituted deposits under both § 1813($l$)(1) and § 1813($l$)(3). The electronically transferred credits were therefore included in the transferee's deposit insurance assessment base. In reaching its conclusion, the Court stressed that even though dollars in hand were not physically transferred, the electronic transactions represented an irrevocable and unpaid obligation between transferor and transferee constituting "money or its equivalent" held in the usual course of the bank's commercial business, within the meaning of 1813($l$)(1). 576 F.Supp. at 955. Reliance on wire communications has been recognized as the normal course of a bank's business, and credits based thereon have been construed as actual payments rather than mere bookkeeping entries. *Liberty Nat'l Bank & Trust Co. v. Bank of America Nat'l Trust & Savings Assn.,* 218 F.2d 831, 838 (10th Cir.1955).

■ These authorities lead the Court to conclude that funds wired through a federal reserve bank are "money or its equivalent" within the meaning of 1813(*l*)(3) and become "deposits" in the receiving bank so long as "final payment" through the Federal Reserve occurs, *supra.* It is apparent that Seafirst's funds were "received ... for the special or specific purpose" of funding the participated loan within the meaning of § 1813(*l*)(3).

■ We conclude that there is a sufficient basis in fact and in law for Seafirst to advance its theory of deposit insurance coverage under 1813(*l*)(3) on the wired funds. The Court holds that monies wired by a participant to the lead, at the lead's direction, for the purpose of funding a participated loan can become "deposits" within the meaning of 12 U.S.C. 1813(*l*)(3) when the wired funds are not drawn by the intended borrower. Accordingly, Seafirst's claim for deposit insurance on the wired funds is sufficient to withstand the Corporation's motion to dismiss.

### Claim for Preference

■ Ordinarily, all general creditors (including depositors) share ratably in distributions from the estate of an insolvent national bank. 12 U.S.C. § 194. Preferred claims are the exception rather than a rule, and they can be established only by meeting the stringent standards established through federal case law (*Hibernia National Bank v. FDIC,* 733 F.2d 1403 (10th Cir.1984)); (*FDIC v. Mademoiselle of California,* 379 F.2d 660, 662–663 (9th Cir. 1967)); *Interfirst Bank Abilene v. FDIC,* 590 F.Supp. 1196 (W.D.Tex.1984). Equitable preferences or trust doctrines recognized under state law must be disregarded when they contradict or vitiate the express federal mandate in the National Bank Act for ratable distributions. *Tompkins v. Bender,* 42 F.Supp. 211, 212–213 (M.D.Pa. 1941); *Bryant v. Linn County,* 27 F.Supp. 562, 564–565 (D.Ore.1938); *Faircloth v. Atlantic City,* 16 F.Supp. 131 (D.N.J.1936).

■ A claimant seeking to establish a preference in its favor under federal law "has a heavy burden of proof," and "unless he clearly and certainly identifies" a specific fund or payment in the Receiver's possession, cognizable in equity as a claimant's own, the preference fails. *Hibernia* 733 F.2d at 1408; *FDIC v. Mademoiselle,* 379 F.2d at 664, 665, citing *Converse Rubber Co. v. Boston-Continental National Bank,* 12 F.Supp. 887, 893 (D.Mass.1935), aff'd 87 F.2d 8 (1st Cir.1936). The basis for a preference requires a "specific fund" or separate, identifiable res, and "there can be no identifiable res unless the transactions result in augmentation of the assets of the bank." *Converse Rubber Co.,* 12 F.Supp. at 891; *accord,* 3 Michie, *Banks & Banking* § 165 at 357–358 (1974).

A finding of augmentation is made according to federal standards. *Ferguson v. Reed,* 44 F.Supp. 387, 389 (E.D.Pa.1942).

■ To constitute an augmentation, it seems to be the universal rule that there either must be such an accretion from the outside or an actual setting apart, or segregation, of the funds of the bank so that at some time there will be an identifiable fund to which a trust can attach and which can be traced to the receiver ... The mere shifting of credits or the substitution of one debtor for another does not result in any augmentation. (Citations)

*Converse Rubber Co.,* 12 F.Supp. 891–892.

■ The wired funds were an infusion of "new money" to Penn Square and were not derived from existing accounts at the bank; hence, they are distinguishable from debts owed by one depositor to another, (*Hoffman v. Rauch,* 300 U.S. 255, 57 S.Ct. 446, 81 L.Ed. 629 (1937)) and they satisfy the augmentation requirement articulated in *Mechanics & Metals National Bank v. Buchanan,* 12 F.2d 891, 892–893 (8th Cir. Okla.1926) and *Converse Rubber Co. v. Boston-Continental Nat'l Bank,* 12 F.Supp. 887, 891 (D.Mass.1935), aff'd 87 F.2d 8 (1st Cir.1936); *see Northern Trust Co. v. FDIC,* 619 F.Supp. 1340, 1343 (W.D.Okl.1985).

The next requirement for a preference is that the augmentation be traced into the Receiver's possession as a segregated part of the bank's estate. "It is indispensable to the maintenance ... of a claim to preferential payment by a receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver." *Mechanics & Metals Bank*, 12 F.2d at 893–894. It is not disputed that Penn Square received the wired funds, but in order to prevail Seafirst must also prove (1) that the funds can be traced into the receivership; (2) that the funds were a special deposit; and (3) that they were not depleted prior to insolvency. *Queenan v. Mays*, 90 F.2d 525, 531 (10th Cir.1937), cert. den. sub nom *Bd. of Commissioners, et al v. Mays*, 302 U.S. 724, 58 S.Ct. 45, 82 L.Ed. 559 (1937); *Kershaw v. Jenkins*, 71 F.2d 647 (10th Cir.1934).

Although state law is not controlling, we note that Oklahoma courts have relaxed the tracing requirement when the special fund has been specifically tagged, even though it could not be specifically traced, so long as the bank's remaining general assets were sufficient to cover its remaining general expenditures. *In re Planters and Mechanics' Bank*, 127 Okl. 209, 260 P. 472 (1927); *Mothersead v. Lewis*, 117 Okl. 167, 245 P. 550 (Okla.1925) (mortgage payment escrow fund constituted special deposit and basis for preference). Additional equitable considerations have been suggested when the insolvent bank was acting as a collecting agent. *First State Bank of Bristow v. O'Bannon*, 130 Okl. 206, 266 P. 472 (1928); *Thomas v. Mothersead*, 128 Okl. 157, 261 P. 363 (1927). In *First State Bank* and *Thomas*, the insolvent bank was both the collecting and the paying bank, so strictly speaking there was no augmentation of assets but merely a shifting of credits from the payor's account to the payee's. Nevertheless, the Oklahoma Supreme Court found that equities weighed in favor of the payee. *First State Bank*, 266 P. at 474.

Under federal standards, however, and even were equities to be considered (as apparently they were by the federal courts in *Tompkins v. Bender* and *John L. Walker Co. v. Alden, et al*, 6 F.Supp. 262, 267 (E.D.Ill.1934)), the special fund's continued existence at the time of insolvency must be proved. It is presently unclear whether Seafirst's wired funds were dissipated or merely comingled with other funds in the "wire suspense account." Under the circumstances, the Court does not believe that comingling alone would destroy the separate character of a special deposit if the other criteria, *supra*, are satisfied. (*See Bryant v. Linn County; Mothersead v. Harrington*, 123 Okl. 179, 250 P. 483 (1926).

Additional evidence is necessary to establish the separate nature of the intended account and the fund's continued existence at the time of insolvency. Pending the introduction of such evidence, Seafirst's claim of preference cannot be established, but the state of the record does not support the Receiver's motion to dismiss Count II as to the preference issue.

### REIMBURSEMENT FOR CONFIRMED LETTERS OF CREDIT

#### Count III

*Plaintiff's Motion*

Seafirst acted as a confirming bank on two 6 million dollar letters of credit issued by Penn Square to Michigan National Bank as beneficiary. The letters were issued to "back-up" loans made by Penn Square and participated to Michigan National. The primary obligors apparently defaulted on their participated notes, and Michigan then drafted on the "back-up" letters. Seafirst honored the drafts upon Michigan's presentment and paid Michigan a total of 12 million dollars on August 19, 1982. Seafirst now seeks reimbursement from the Receiver under UCC § 5–107(2), Okla. Stat.Ann. Title 12A § 5–107(2) (West, 1963). That statute provides that a confirming bank which honors a letter right is entitled to reimbursement from the issuing bank if the beneficiary's draft conformed to the

letter's terms. *Instituto Nacional De Comercializacion Agricola v. Continental Illinois National Bank*, 530 F.Supp. 279, 282–283 (N.D.Ill.1982).

Most (though not all) of the circuits which have spoken on the matter have held that both an issuing and a confirming bank are entitled to demand a beneficiary's "strict compliance" with the terms of presentment specified in a letter of credit. *Board of Trade of San Francisco v. Swiss Credit Bank*, 728 F.2d 1241 (9th Cir.1984); *Banco Nacional de Desarollo v. Mellon Bank, N.A.*, 726 F.2d 87 (3rd Cir.1984); *Consolidated Aluminum Corp. v. Bank of Virginia*, 704 F.2d 136 (4th Cir.1983); *Voest-Alpine International Corp. v. Chase Manhattan Bank*, 707 F.2d 680 (2nd Cir.1983); *accord, American National Bank and Tr. v. Hamilton Industries*, 583 F.Supp. 164 (N.D.Illinois 1984); *but see Tosco Corp. v. FDIC*, 723 F.2d 1242 (6th Cir.1983) (district court did not err in holding "strict compliance" doctrine inapplicable to slight variances in abbreviation and capitalization). In *Liberty National Bank & Trust Co.*, 218 F.2d at 840–841 (10th Cir.1955), our circuit held that a letter's expiration date requires strict compliance. This decision suggested but did not expressly hold that other terms of payment should be measured with similar exactitude. In *Bank of Montreal v. Federal National Bank & Trust Co. of Shawnee, et al.*, 622 F.Supp. 6, 7 (W.D.Okla.1984) this Court adopted the strict compliance rule for presentment of letters of credit.

Michigan's presentment may not have met this standard. The letters of credit stated that: 1) they must be "drawn at sight;" 2) they must be "marked as drawn under this credit, with specific reference to the number of this credit;" 3), they must be accompanied at presentment by a "signed statement that the amount drawn is due you in connection with Penn Square Bank N.A.'s note"; and 4) presentment of the "original" letter of credit must also be made. To establish that its payment conformed to these specified terms, Seafirst filed the affidavit of its assistant vice president. The affiant stated that certain sight drafts were presented to her by an agent for Michigan National Bank on August 16, 1982, accompanied by letters from Michigan National's Executive Vice President certifying that the letters were due in connection with the particular notes. Seafirst's vice president attested that the documents conformed with the presentment requirements described in the letters of credit. Likewise, Seafirst's amended complaint asserts that Michigan National "presented the required documents" when it demanded payment on the letters. However, it is not apparent whether the *original* letters of credit were presented at the time of the draft (Condition "4," supra). If the letters were not presented, their omission would render Michigan National's presentment deficient under the "strict compliance" standard.

■ Although even the strict compliance requirement can be waived by an issuing bank (*Barclay's Bank, D.C.O. v. Mercantile National Bank; Tosco Corp. v. FDIC; Voest-Alpine v. Chase Manhattan Bank; American National Bank & Tr. v. Hamilton Industries*), waiver by the confirming bank alone will not bind the original issuer, which may still insist on strict compliance as a condition for reimbursing the confirming bank. *Courtaulds North American Inc. v. North Carolina National Bank*, 528 F.2d 802, 806–807 (4th Cir. 1975); *Voest-Alpine v. Chase Manhattan Bk; American Nat'l Bank & Trust v. Hamilton; Instituto Nacional.* This is true because the confirming bank owes to its customer, the issuer, a duty of careful documentary examination under UCC § 5-109, (Okl.Stat.Ann. tit. 12A Section 5-109), just as the issuing bank owes that duty to *its* customer, the account party on the letter. *Auto Servicio San Ignacio S.R.L. v. Compania Anonima Venezolana de Navegacion*, 765 F.2d 1306 (5th Cir.1985); *Instituto Nacional.* The duty of careful inspection owed under the U.C.C. is a condition precedent to the confirming bank's collection from the issuer. *Instituto Nacional*, 530 F.Supp. at 279.

■ At this stage, it appears possible that the original letters of credit were not presented with Michigan National's draft, which would render the draft nonconforming; it appears equally possible that Seafirst waived whatever defects existed. Whether either or both of these possibilities actually occurred requires the determination of material issues of fact and law. Thus, plaintiff's motion for summary judgment on Count III must be denied.

## Count III

### Defendant's Motion

Although the preceding discussion is dispositive of Plaintiff's summary judgment motion on Count III, the Receiver has also moved for summary judgment on Count III and the motions must be considered separately. *SEC v. American Commodity Exchange, Inc.*, 546 F.2d 1361–1365 (10th Cir. 1976); *Midland Mortgage Co. v. U.S.*, 576 F.Supp. 101, 106 (W.D.Okla.1983); 10A C. Wright, A Miller, M. Kane, *Federal Practice and Procedure*, Civil § 2720 (1983).

The Receiver alleges that Seafirst knew that the letters of credit were issued by Penn Square in conjunction with a loan exceeding Penn Square's statutory lending limit (12 U.S.C. § 84). According to the Receiver, Seafirst knew or should have known that because the underlying loans were improper, the letters were unenforceable and therefore Seafirst's recovery should be barred. Although letters of credit are now subject to a bank's lending limits, 12 U.S.C. § 84(c)(2); 12 C.F.R. §§ 32.2(e), 32.3 (1985), the limits were not applicable to letters when the instant confirmations occurred.

■ Moreover, the independence principle holds that a confirmation agreement on a letter of credit is independent of the issuing bank's loan contract with its borrower, so an infirmity in the loan does not impair the letter. *Philadelphia Gear*, 751 F.2d 1131, 1136–1137 (10th Cir.1984). That the loans were excessive does not render the letters unenforceable. *FDIC v. Freudenfeld*, 492 F.Supp. 763, 770 (E.D. Wisc.1980).

■ The Receiver also asserts that Seafirst participated in the loans themselves, as well as confirming the letter of credit, but Seafirst denies its participation. On the issue of Seafirst's status as a participant rather than a confirming, bank, the Receiver cites evidence in the record of participation certificates executed by the parties. On the other hand, Seafirst tenders evidence of subsequent correspondence indicating a confirmation. (Neither party disclaims confirmation; the claims differ only on whether a participation existed as well.) Thus, there is a factual dispute concerning Seafirst's role in the loan. This controversy is wholly immaterial to Seafirst's liability as confirming bank on the letters of credit, however.

The FDIC further alleges that Seafirst's claims were not provable in the Receivership because they derive from letters of credit that were merely executory contracts and contingent liabilities at the time Penn Square was declared insolvent. In the deposit insurance context, *Philadelphia Gear Corp. v. FDIC*, held that standby letters of credit were indeed provable claims, so long as they met certain criteria enunciated in *First Empire Bank v. FDIC*, 572 F.2d 1361 (9th Cir.1978), *cert. denied* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), app. after rem. 634 F.2d 1222, cert. den. 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 406 (1981). Similarly this Court and the Tenth Circuit have held that standby letters of credit were not executory contracts but instead represented "an absolute, primary obligation of the issuing bank to the beneficiary." *Philadelphia Gear*, No. CIV 82–1191–W (W.D.Okla. Feb. 9, 1984) *slip op.* at 16. We are neither inclined nor authorized to deviate from this Circuit's rulings, and the Receiver's continued entreaties to overlook or overrule *Philadelphia Gear* are not helpful. We hold that Seafirst's performance as a confirming bank on letters of credit could entitle it to a claim against Penn Square's receiver for reimbursement according to § 5–107.

None of the Receiver's asserted defenses regarding excess loan limitations, participation in the underlying loan, or contin-

gent liabilities would defeat Seafirst's recovery on count III if Seafirst can establish that it honored the Michigan National drafts upon proper presentment. Therefore, the Receiver is not entitled to judgment as a matter of law on Count III, and its Motion for Summary Judgment as to that count will be denied.

## DEPOSIT INSURANCE ON LETTERS OF CREDIT

### Count IV

Seafirst asserts an equitable interest in standby letters of credit issued by Penn Square to itself as beneficiary, allegedly for the purpose of securing loans that were participated to Seafirst. In Seafirst's view, the terms of the participation confer a trust interest in the letters that served as collateral.

The Court's discussion concerning trust interests in participated loans in § 1, *supra* applies as well to the trust interests arguably created in the letters as collateral for the loans.

 Ordinarily, "the beneficiary is the only party permitted to make a demand on the issuing bank for amounts under the letter of credit." *Philadelphia Gear*, 751 F.2d at 1138. The unique twist in this case is Seafirst's assertion that the letters themselves were security for the loan, based on Penn Square's "back up" language. Penn Square's triple role as 1) lender on the note; 2) issuer of the letter of credit; and 3) beneficiary of the letter is indeed puzzling. Nevertheless, viewing Seafirst's allegations as true, Plaintiffs asserted trust interest in the letters did not meet the statutory or regulatory criteria for deposit insurance coverage. 12 U.S.C. § 1822(c) (name of depositor/claimant must be disclosed on bank records); 12 CFR § 330.1(6) (no insurance paid to undisclosed depositor). *Philadelphia Gear* is distinguishable because the claimant there was the named beneficiary of the letter, whereas Seafirst is not named anywhere in the letter and asserts depositor status only by virtue of the loan participation.

Accordingly, the corporation's motion to dismiss Count IV is granted.

## CONCLUSION

The Receiver's motion to dismiss Count I is granted. The Corporation's motion to dismiss Count II is denied. The Receiver's motion for summary judgment on Count III is denied. Seafirst's motion for summary judgment on Count III is denied. The Corporation's motion to dismiss Count IV is granted.